LOUIS MICHAEL CHING 4209
ATTORNEY AT LAW
4475 KILAUEA AVENUE
HONOLULU, HAWAII 96816
TEL: (808) 392-8727

ATTORNEY FOR DEFENDANT
DUANE NISHIIE

IN THE UNITED STATES OF DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 17-00550-SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DUANE NISHIIE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | DEFENDANT DUANE NISHIIE'S |
| | ) | MOTION TO DISMISS GRAND JURY |
| | ) | INDICTMENT FOR VIOLATION OF |
| | ) | THE STATUTE OF LIMITATIONS; |
| | ) | CERTIFICATE OF SERVICE |
| | ) | |
| _____ | ) | |

DEFENDANT DUANE NISHIIE'S MOTION TO DISMISS GRAND JURY
INDICTMENT FOR VIOLATION OF THE STATUTE OF LIMITATIONS

The Defendant Duane Nishiie, by and through his counsel, Louis Michael Ching, hereby respectfully moves this Honorable Court for an Order dismissing the charges and/or the Federal Grand Jury Indictment for violation of the Statute of Limitations in each count.

Defendant Duane Nishiie is one of two defendants in the Indictment filed September 21, 2017.  The federal grand jury indictment lists the following charges:

Count 1: 18 USC 371 (Conspiracy)                            (2008 to April 1, 2015)
(Statute of Limitaions: 5 years)

Count 2:  18 USC 2, 201(b) (Receiving a bribe by a          (Sept. 2008 to May 2012)
Public Official)
(Statute of Limitaions: 5 years)

Count 3:  18 USC 1343, 1346  (Honest Services – Wire Fraud)     (Sept. 18, 2008)
(Statute of Limitaions: 10 years for 1343/ 5 years for 1346)

Count 4:  18 USC 1343, 1346  (Honest Services – Wire Fraud)      (Mar.  20, 2009)
(Statute of Limitaions: 10 years for 1343/ 5 years for 1346)

Count 5:   18 USC 1343, 1346  (Honest Services – Wire Fraud)     (April 6, 2010)
(Statute of Limitaions: 10 years for 1343/ 5 years for 1346)

Count 6:   18 USC 1956(h) (Conspiracy to Launder            (2008 to 2013)
Monetary Instruments)
(Statute of Limitaions: 5 years)

Count 7:  18 USC 1001  (False Statement – OGE-450)          (Feb. 9, 2010)
(Statute of Limitaions: 5 years)

Count 8:   18 USC 1001  (False Statement – OGE-450)         (Jan. 18, 2011)
(Statute of Limitaions: 5 years)

Count 9:   18 USC 1001  (False Statement – OGE-450)          (Jan. 13, 2012)
(Statute of Limitaions: 5 years)

Forfeiture Notice re: (Counts 1-5 & 6).

     Sometime in the early 2000's, the United States of America and the Republic of Korea agreed to consolidate all of the American bases spread throughout South Korea into one main American base.  A total of 173 bases would be relocated to Pyeongtaek, which is about 40 miles south of Seoul.  The project was known as the Yongsan Relocation Program.  The ambitious project would create the largest American military base outside of the United States of America.  It would house approximately 45,000 residence.  It would have approximately 650 buildings.  It would be roughly the size of Washington, DC.  The cost was projected to run 10.8 billion dollars.  93% of the cost would be borne by South Korea and 7% borne by the USA.  It would be an expansion of the original Camp Humphreys.  As of today, it has exceeded 18 billion dollars in its final completion stages .

     However, before the project could be realized, construction companies from all over South Korea had to bid on the construction project which began in 2008.  There are 2 main parcels of land which are at issue in this case, to wit, the LDUI parcel 2A and JTO16.  The LDUI parcel 2A was the development of the infrastructure of part of Camp Humphreys in 2008.  It was a large undertaking and estimated to cost around $400 million USD, but due to numerous changes in the original building design and plans, the project cost has exceeded $800 million USD today.   The JTO16 was a relatively small project to build the housing for the team which would be responsible for the coordination

and implementation of the construction projects for Camp Humphreys in 2010. It's estimated value was approximately 7 million USD. The Korean company which ultimately received the contact was the SK corporation or a smaller engineering unit of SK.

The USA was represented by the US Army. The US Army Corps of Engineers was the arm of the US Army which was responsible for implementing the contracts for construction. The FED was a smaller division that was assigned to korea to represent the US Army of Corps of Engineers there. Defendant Duane Nishiie was contract specialist working for FED. At the other end, was the Korean side. The Korean Ministry National Defense (MND) which had a specialized division called, MURO, was in charge of implementing contracts on behalf of MND. The co-defendant Seung-Ju Lee was at a higher position than Defendant Nishiie on the technical side for the Korean government. The two respective governments employed the services of KC-PMC which coordinated and supervised the actual construction and reported back to both the FED and MURO.

The allegations are the both Defendant Duane Nishiie working for FED and Co-Defendant Seung-Ju Lee working for MURO, conspired together and with others to make it possible that the SK corporation had an advantage over any other bidder(s) in obtaining the contracts for the LDUI parcel 2A and JTO16 project, in exchange for a large sum of money given to Defendants Nishiie and Lee.

When a statute of limitations expires in a criminal case, the courts no longer have jurisdiction. "Most statutes of limitations," the Court explained, "seek primarily to protect defendants against stale or unduly delayed claims." John R. Sand & Gravel Co.

v. United States, 552U.S. 130, 128 S.Ct. 750, 753, 169 L.Ed.2d 591 (2008). When construing a statute containing a strict limitations period, the Court has "often read the time limits as more absolute, say as. Id.

The main purpose of the statute of limitations is to keep defendants from having to defend themselves from charges that occurred so far into the past that it makes it impossible to properly defend oneself. In many of these cases, evidence may no longer be available, making it harder to defend oneself and prove one's innocence. It would violate the defendant's right to receive due process under the law and the right to receive a fair trial if a prosecution was to take place under those conditions.

In the instant indictment, except for 18 USC 1343 (Counts 3,4,&5), the Statute of Limitations is 5 years.  18 U.S. Code § 1031. Major fraud against the United States is not applicable here.  The federal grand jury indictment was filed on September 21, 2017. Therefore, any count or crime which ended on or before September 21, 2012 should be dismissed for lack of jurisdiction and in violation of the Statute of Limitations.

Further, the Government claims that Defendant Nishiie failed to file his tax returns (ie. 1040 forms)  in 2011, 2012, and 2013 years (See Grand Jury Indictment on page 14, paragraph 69).  However, the statute of limitations for the IRS to assess taxes on a taxpayer expires three (3) years from the due date of the return.  Specifically, 26 U.S. Code § 6501(a) provides, in part, "Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within three years after the return was filed (whether or not such return was filed on or after the date prescribed)."

The law that governs statute of limitations relating to criminal tax offenses is §

6531, which provides:

"No person shall be prosecuted, tried, or punished for any of the various offenses arising under the internal revenue laws unless the indictment is found or the information instituted within 3 years next after the commission of the offense." (ie. some exceptions for a 6 year statute of limitations not applicable here).

The defense anticipates that the Government will propose that the Statute of Limitations was tolled by 18 USC 3282 (Wartime suspension of limitations). The Wartiime suspension of limitations suspends the statute of limitations for a 5 year period after the termination of hostilities.

I. UNDERSTANDING AND ASSESSING THE ORIGINAL WSLA
The relevant text of the original WSLA states:

When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States . . . shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress. The Act was originally signed into law in 1942 by President Franklin D. Roosevelt, who vigorously spoke out against "war millionaires" and profiteers who exploited the calamity of war. Throughout his presidency, whenever Roosevelt requested further funding for military spending, "it was usually accompanied by legislation for the 'prevention of profiteering.'" In 1948, WSLA was permanently enshrined in Title 18 of the United States Code by President Harry S. Truman, who as a senator had held public hearings to expose fraud and waste by contractors during the war. Prosecutors attempted to apply WSLA to a wide range of fraudulent acts in the immediate post–World War II years with mixed success.

However, in the instant case, the Korean War ended by an armistice signed on **July 27, 1953**, formally ended the war in Korea.

The **Korean Armistice Agreement** is the armistice which brought about a complete cessation of hostilities of the Korean War. It was signed by U.S. Army Lieutenant General William Harrison, Jr. representing the United Nations Command (UNC), North Korean General Nam Il representing the Korean People's Army (KPA), and the Chinese People's Volunteer Army (PVA). The armistice was signed on 27 July 1953, and was

designed to "ensure a complete cessation of hostilities and of all acts of armed force in Korea until a final peaceful settlement is achieved." Korean Armistice Agreement From Wikipedia

Therefore, the WSLA ceased to toll any statute of limitation in the instand case since 1953. The statute of limitations in each count starts after the criminal act is completed. The Supreme Court has repeatedly counseled that the Act "should be 'narrowly construed' and 'interpreted in favor of repose.'" *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1978 (2015) (quoting *Bridges v. United States*, 346 U.S. 209, 216 (1953)).

THE WARTIME SUSPENSION OF LIMITATIONS
ACT, THE WARTIME ENFORCEMENT OF
FRAUD ACT, AND THE WAR ON TERROR
*Erin M. Brown\**

Under the original WSLA, determining when the United States
was technically at war was vague and abstract; the new amendment
helps to clarify this ambiguity, although its definition of "at war" still
leaves substantial gaps in the statute's application. As Senator
Leahy detailed in a press release, the original WSLA applied only
when the United States was "at war," yet the military operations in Iraq
and Afghanistan were undertaken without congressional declarations
of war. Throughout the last half century, in fact, the United States
has never been "at war" in the conventional sense of the term. Since
World War II, Authorizations for the Use of Military Force (AUMF),
such as the AUMF preceding the second Iraq invasion, have been
used more frequently in place of conventional declarations of war.
WEFA suspends the statute of limitations not only for formal declarations
of war, but also for congressional AUMFs consistent with the
War Powers Resolution. It does not, however, apply to international
peacekeeping missions under the United Nations or under any
military actions not specifically authorized by Congress. "As a
result, only significant military actions requiring congressional action
trigger this suspension of the statute of limitations."

Senators Leahy and Grassley introduced the Wartime Enforcement of Fraud Act (WEFA) in an attempt to modernize WSLA.

Under the original WSLA, there was no express definition of what Congress meant by the phrase "at war." Surely, the 70th Congress viewed the phrase "at war" through the lens of the only wars and conflicts that it knew: World War I and World War II. The reality, however, is that since the statute was enacted, the United States has simply not declared war, "despite prolonged engagements in Korea, Vietnam, Kosovo, Afghanistan, and Iraq (twice) and shorter deployments in Panama, Grenada, Haiti, and Somalia, among others." The drafters' understandably myopic view of war hardly represents the twenty-first century realities of armed conflict, which ranges from peacekeeping missions, to democratic occupations, to threats of possible full-scale conflicts, and to the amorphous war on terror. Although one could look at other contemporary or prior statutes that use the phrase "at war" for interpretational guidance, this would not reveal a clear or consistent definition of the phrase. In fact, courts have interpreted the term "at war" in other statutes to include both formal and informal conflicts. Courts have also held that "Congress in drafting laws may decide that the Nation may be 'at war' forone purpose, and 'at peace' for another." Unfortunately, in drafting WSLA, Congress did not decide at all. While there are myriad similar statutes and canons of construction which could theoretically aid in the interpretation of such a vague statute, the ambiguous and amorphous threat environment that exists today only makes interpreting "at war" even more complicated.

WEFA, while establishing a definition of "at war" that ignores significant modern forms of conflict, does provide more rigid guidance for the courts in deciding when the nation is at war. Such guidance will help uphold traditional separation of powers requirements. First, the amendment requires that the war must be officially declared by Congress (either through an official declaration or an AUMF). Second, it mandates that the war, as defined, must be ended by Congress or by a Presidential proclamation, with notice to Congress. Both of these developments are important, as they ensure that WSLA will no longer require a judge to determine when the United States is at war (the Big Dig problem). In fact, a main impetus for the amendment, as stated by the drafters of WEFA, was "so courts, prosecutors, and litigants can be sure when the statute of limitations starts to run."

In the instant case, the Korean War ended by an armistice signed on **July 27, 1953**, formally ended the war and hostilies in Korea.

But the WSLA does NOT include acts of concealment. Concealment of the criminal plot After its completion is considered a natural component of all conspiracies.

Consequently, overt acts of concealment after the objectives of the conspiracy have been accomplished may not be used to delay the running of the statute of limitations. United States v. Smith, 568 U.S. 106, 107 (2013); Martinez, 862 F.3d at 232-33; United States v. Heard, 709 F.3d 413, 427 (5th Cir. 2013); United States v. Arias, 431 F.3d 1327, 1340 (11th Cir. 2005); United States v. Hitt, 349 F.3d 1010, 1015 (D.C. Cir. 2001); United States v. Monaco, 194 F.3d 381, 387 n.2 (2d Cir. 1999).

Therefore, Count 1: 18 USC 371 (Conspiracy) ended at the last alleged transaction of bribe money from SK Corporation to the Defendants Nishiie and Lee in or about May 2012. Any acts occurring after May 2012 would have been characterized as concealment or obstruction of justice, but not part of the conspiracy for purposes of calculating the Statute of Limitations. See Indictiment page 14; lines 70-74.

Further, the WSLA only includes those crimes involving fraud or attempted fraud against the United States (not Counts 3, 4, 5, 6, 7, 8, 9, or forfeiture statute & notice).

The Supreme Court handed down its decision in Kellogg, Brown & Root Services, Inc. v. U.S. ex rel. Carter. This case concerned the Wartime Suspension of Limitations Act (WSLA), a statute that suspends the statute of limitations for "any offense" involving fraud against the US government "when the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces[.]" 18 U.S.C. § 3287.

In recent years, courts including the Fourth Circuit and the Fifth Circuit have held that because Congress passed specific Authorizations for the Use of Military Force, the WSLA has applied since the beginning of US. military operations in Afghanistan in 2001 and Iraq in 2002. See U.S. v. ex rel. Carter v. Halliburton Co., 710 F.3d 171, 179 (4th

Cir. 2013); *U.S. v.* Pfluger, 685 F.3d 481, 485 (5th Cir. 2012).

In this week's unanimous opinion, the Court reversed the Fourth Circuit's application of the WSLA to a civil False Claims Act (FCA) action, holding that the WSLA "must be construed to refer only to crimes." 576 U.S. ___, 12-1497, slip op. at 11 (May 26, 2015). To that end, where a "case involves civil claims, the WSLA does not suspend the applicable statute of limitations**."** Id.

Therefore the Forfeiture Notice of the instant indictment is also barred by the Statute of Limitations.

Hence, for all of the foregoing arguments, the Defense respectfully requests an Order from the Court dismissing the charges and/or the Federal Grand Jury Indictment in the instant case as against Defendant Duane Nishiie.

DATED: Honolulu, Hawaii,  June 23, 2019.

/s/ *Louis Michael Ching*
_____
LOUIS MICHAEL CHING, ESQ.
Attorney for Defendant
Duane Nishiie