IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 17-00550 SOM |
| | ) | |
| Plaintiff, | ) | ORDER REJECTING ARGUMENT THAT |
| | ) | THE WARTIME SUSPENSION OF |
| vs. | ) | LIMITATIONS ACT TOLLS THE |
| | ) | STATUTES OF LIMITATIONS WITH |
| | ) | RESPECT TO THE CRIMES ALLEGED |
| DUANE NISHIIE, aka "Suh Jae | ) | IN THE INDICTMENT |
| Hon"; and SEUNG-JU LEE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER REJECTING THE ARGUMENT THAT THE WARTIME SUSPENSION OF
LIMITATIONS ACT TOLLS THE STATUTES OF LIMITATIONS WITH
RESPECT TO THE CRIMES ALLEGED IN THE INDICTMENT**

This court must determine whether a modifying clause in
a statute applies to all three categories of crimes listed in the
statute, or to just the category closest to the modifying clause.
If the modifier applies to all three categories, then at least
some of the charges against Defendant Duane Nishiie may be time-
barred.  If, on the other hand, the modifier applies only to the
closest category, the limitations periods applicable to the
charges in this case are tolled, and all of the charges against
Nishiie are timely.  Having parsed the language of the statute
and having considered its legislative history, this court, guided
by the "rule of lenity," concludes that the modifier applies to
all three categories.  The court orders supplemental submissions
addressing the impact of this determination.

## I.    THE WARTIME SUSPENSION OF LIMITATIONS ACT.

The statute at the crux of the limitations discussion is the Wartime Suspension of Limitations Act ("WSLA"), which reads:

> When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)), the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or settlement, or any contract, subcontract, or purchase order **which is connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces, or with any disposition of termination inventory by any war contractor or Government agency,** shall be suspended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress.

> Definitions of terms in section 103 of title 41 shall apply to similar terms used in this section.  For purposes of applying such definitions in this section, the term "war" includes a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)).

This court's focus is on what words are modified by the "which" clause that this court has emphasized in boldface. Do they modify (1), (2), and (3), or only (3)?

Initially enacted in the wake of World War II, the WSLA has been construed by the Supreme Court and lower courts. It has also been amended. In making the present ruling, this court acknowledges that competing canons of construction are in play, and that there are matters of punctuation and syntax that may pull in different directions. This court attempts to address those matters. But this court recognizes that focusing only on the text of the statute does not lead to a definitive reading of the statute. For that reason, this court's analysis includes a detailed examination of congressional purpose, not just with respect to the original statute but also with respect to the 2008 amendment.

Nishiie has moved to dismiss the charges against him. He argues that the charges are all time-barred. The Government's response is that any charge brought more than five years after the alleged commission of any crime charged in the Indictment is timely because, under the WSLA, the five-year statute has been suspended.

II.      **CHARGES AGAINST NISHIIE.**

Defendant Duane Nishiie allegedly worked as a United States contracting officer in Seoul, Korea, for the section of

the United States Army Corps of Engineers known as the Far East District.  The United States proposed to relocate and consolidate some of its military installations in South Korea.  Nishiie allegedly saw this as a chance to enrich himself.  Among other things, in return for money, he allegedly provided advantages to a large multinational company that was bidding on a government project.

Nishiie has been charged in an eight-count indictment filed on September 21, 2017.  Some of the charges are also asserted against Co-Defendant Seung-Ju Lee.

Count One asserts that, in violation of 18 U.S.C. § 371,[1] Defendants conspired 1) to receive something of value in return for being influenced in the performance of an official act

---

[1]Section 371 states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

in violation of 18 U.S.C. § 201(b)(2)[2] and 2) to defraud and

deprive the public of honest services through bribery in

violation of 18 U.S.C. § 1343.[3]  Specifically, the Indictment

_____

[2]Section 201(b)(2) states:

> Whoever . . . (2) being a public
> official or person selected to be a public
> official, directly or indirectly, corruptly
> demands, seeks, receives, accepts, or agrees
> to receive or accept anything of value
> personally or for any other person or entity,
> in return for:
>
> (A) being influenced in the performance of
> any official act;
>
> (B) being influenced to commit or aid in
> committing, or to collude in, or allow, any
> fraud, or make opportunity for the commission
> of any fraud, on the United States; or
>
> (C) being induced to do or omit to do any act
> in violation of the official duty of such
> official or person.

[3]Section 1343 states:

> Whoever, having devised or intending to
> devise any scheme or artifice to defraud, or
> for obtaining money or property by means of
> false or fraudulent pretenses,
> representations, or promises, transmits or
> causes to be transmitted by means of wire,
> radio, or television communication in
> interstate or foreign commerce, any writings,
> signs, signals, pictures, or sounds for the
> purpose of executing such scheme or artifice,
> shall be fined under this title or imprisoned
> not more than 20 years, or both. If the
> violation occurs in relation to, or involving
> any benefit authorized, transported,
> transmitted, transferred, disbursed, or paid
> in connection with, a presidentially declared
> major disaster or emergency (as those terms

alleges that, from 2008 through 2015, Defendants accepted bribes to influence the awarding of multi-million-dollar military contracts in Korea.  A five-year limitations period applies to violations of § 371.  *See United States v. Walker*, 653 F.2d 1343, 1344 (9th Cir. 1981) (applying five-year limitations period found in § 3282 to § 371 charge); *United States v. Davis*, 533 F.2d 921, 926 (5th Cir. 1976) ("In a conspiracy prosecution brought under § 371 the government in order to avoid the bar of the limitations period of § 3282 must show the existence of the conspiracy within the five years prior to the return of the indictment, and must allege and prove the commission of at least one overt act by one of the conspirators within that period in furtherance of the conspiratorial agreement."); 18 U.S.C. § 3282(a) ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").

Count Two asserts a substantive violation of 18 U.S.C. § 201(b)(2), alleging that, from 2008 through 2012, Defendants

---

are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

received bribes in return for which Nishiie, a public official, was influenced in the performance of his official acts with respect to awarding military contracts in Korea.  The applicable limitations period for a § 201(b)(2) violation is five years. *See* 18 U.S.C. § 3282(a).

Counts Three through Five allege that, in violation of 18 U.S.C. § 1343, Defendants used wire communications in interstate and foreign commerce from 2008 through 2015 to further a scheme or artifice to defraud the United States by receiving bribes and kickbacks with respect to the awarding of military contracts.  Generally, the applicable limitations period for a § 1343 violation is five years.  *See United States v. Aubin*, 87 F.3d 141, 147 (5th Cir. 1996) (stating that the five-year limitations period of 18 U.S.C. § 3282 is generally applicable to wire fraud violations, but that the ten-year limitations period of 18 U.S.C. § 3293 applies when a § 1343 offense affects a financial institution); 18 U.S.C. § 3282(a).

Count Six alleges that, from 2008 through 2013, Defendants conspired to launder money constituting the proceeds from unlawful activity, violating 18 U.S.C. § 1956(h).  "The statute of limitations for actions brought under § 1956(h) is five years."  *United States v. LaSpina*, 299 F.3d 165, 173 (2d Cir. 2002) (2000) (citing 18 U.S.C. § 3282).

Counts Seven, Eight, and Nine allege that, in violation of 18 U.S.C. § 1001, Nishiie made materially false, fictitious, and fraudulent statements in 2010, 2011, and 2012, by failing to disclose all reportable assets, sources of income, and outside position on confidential financial disclosure reports. A five-year limitations period applies to violations of § 1001. *See United States v. Smith*, 740 F.2d 734, 736 (9ᵗʰ Cir. 1984) (applying five-year limitations period to § 1001).

The Indictment also seeks forfeiture of all property involved in Counts One through Six.

## III.    ANALYSIS.

The court spends considerable time discussing the language of the WSLA, concluding that more than one reading is reasonable. It is in light of that ambiguity that the court examines the legislative history of the WSLA, focusing on what Congress intended to accomplish by passing the WSLA and its 2008 amendment.

### A.    The Text of the WSLA Can Be Reasonably Read in More Than One Way.

When the plain language of a statute is reasonably clear, courts enforce that plain language unless it leads to unreasonable or impracticable results. *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("Where the language is plain and admits of no more than one meaning, the duty of

interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion."); *Animal Legal Def. Fund v. United States Dep't of Agric.*, 933 F.3d 1088 (9th Cir. 2019) ("If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there." (quotation marks and citation omitted)); *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012) (stating that "statutory interpretation begins with the statutory text. If the statutory language is unambiguous and the statutory scheme is coherent and consistent, judicial inquiry must cease." (alterations, quotation marks, and citation omitted)); *United States v. Gallegos*, 613 F.3d 1211, 1214 (9th Cir. 2010) ("If the plain language of a statute renders its meaning reasonably clear, we will not investigate further unless its application leads to unreasonable or impracticable results." (alterations, quotation marks, and citations omitted)).

When statutory language is ambiguous, courts frequently look to canons of construction, legislative history, the statute's overall purpose, the historical context, and the specific sequence of events leading to the passage of the statute to discern Congress's intent. *See Edwards v. Aguillard*, 482 U.S. 578, 595 (1987); *Moran v. Screening Pros, LLC*, 923 F.3d 1208, 1215 (9th Cir. 2019); *Gallegos*, 613 F.3d at 1214; *see also BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 764 (9th Cir. 2018) ("Where the plain language of a provision is open to

more than one interpretation, we may look to legislative history to clarify its meaning"); *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008) ("If the terms are ambiguous, we may look to other sources to determine congressional intent, such as the canons of construction or the statute's legislative history.").

"A statute is ambiguous if it is susceptible to more than one reasonable interpretation." *Ariz. v. Tohono O'odham Nation*, 818 F.3d 549, 556 (9th Cir. 2016) (quotation marks and citation omitted). The language and syntax of the WSLA establish that the WSLA is susceptible to more than one reasonable interpretation.

The first paragraph of the WSLA is the only paragraph in issue in the present order. That first paragraph consists of one very long sentence. This sentence can be stripped down into what every sentence requires: a subject and a verb. Then the words modifying the subject and the verb can be identified. The dispute between the parties lies in which word ("offense" vs. "contract") one of those modifiers, the "which" clause, attaches to.

The subject of the long sentence is, in its simplest form, a single word. But that word--"running"--is encrusted in modifiers. Some of the modifiers (e.g., the word "the") are easily pulled away and are of no consequence to this analysis. Others are more complex.

The first substantive modifier of the subject of the sentence is the prepositional phrase immediately following "running"--"of any statute of limitations applicable to any offense."  This prepositional phrase actually includes an ellipsis: the words "that is" have been left out but are implied. If all the implied words were expressly stated, the "of" prepositional phrase would read:  "of any statute of limitations that is applicable to any offense."  The entire "of" prepositional phrase functions as an adjective; it modifies a noun ("running"), telling us what kind of "running" is being addressed.  Although using more words, this prepositional phrase functions grammatically in exactly the same way as the prepositional phrase in "the taste of a lemon."

Then the statute moves to modifying the modifiers. That is, we are presented with a kind of third-generation modifier; the "of" prepositional phrase--itself modifying "running"--includes a clause (the elliptical "that is applicable to any offense") containing another noun ("offense"--the object of the preposition "to"), and the statute proceeds to modify the word "offense" by telling us what kind of offense is covered.  In fact, in participial phrases, the statute identifies three kinds of offenses: (1) those involving fraud, (2) those relating to real or personal property, (3) those relating to a contract.

Some of the charges against Nishiie could easily fit into category (3), but the Government argues that they should be viewed as fitting under category (1). The reason for the Government's preference is that the long statutory sentence includes yet another modifier, this time in the form of what I have been calling the "which" clause. "Which" is a relative pronoun that introduces a clause that clearly functions as an adjective; the big question is what noun the "which" clause modifies.

The Government posits that the "which" clause modifies only the contracts referred to in the third enumerated kind of offense covered by the WSLA. Although, as modified above, the charges against Nishiie actually fit into category (3), in urging the court to deem them as falling instead within category (1), governing fraud, the Government seeks to avoid the impact of the "which" clause. The clause clearly requires a nexus between an offense and a war or an authorization for the use of the Armed Services. The court is concerned that the Government has not sufficiently analyzed whether the WSLA can be reasonably read as attaching the nexus requirement in the "which" clause to all three enumerated offense types.

A schematic of the subject of the long sentence might be helpful. But before presenting such a diagram, this court completes its parsing of the long sentence. The verb in the

sentence is compound: "shall be suspended."  That verb, like the subject of the sentence, has several modifiers.  It is modified by the "when" clause at the very beginning of the long sentence ("When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b))").  This "when" clause, like all clauses, has a subject and a verb.  In fact, it has two subjects, each with its own verb:  "the United States is at war," and "Congress has enacted a specific authorization."  Even though the "when" clause is separated from "shall be suspended" by the subject of the sentence and its encrusting modifiers, the "when" clause functions as an adverbial modifier.

The verb has a second adverbial modifier, this one beginning with the word "until" ("until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress").  Both the "when" clause and the "until" clause define the time when the running of the statutes of limitations is suspended.

Despite its modifiers, the verb does not appear to present any dilemma in this case.  This court therefore restricts its promised diagram to the subject of the long sentence.  Each of the enumerated types of offenses, like the "which" clause, includes a string of verbs and a string of objects of the verbs.

The court, solely to simplify the diagram, restricts itself to including in its diagram only the first verb and first object in diagraming the enumerated types of offenses, and to the reference to "war" in the "which" clause. The subject of the long sentence, as described above, can be illustrated in the following Diagram A:[4]

Diagram A



[4] I join the class of judges who, when they include sentence diagrams in their rulings, feel free to adopt a variety of formats. *See* James Durling, "Comment: Diagramming Interpretation, 35 Yale Journal on Regulation 325 (2018).

The Government's reading of the subject of the long sentence treats the "which" clause as modifying the word "contract" in the third enumerated type of offense, as shown in Diagram B.

Diagram B



It appears to the court that, from a purely syntactic point of view, it is not possible to say with absolute certainty that either Diagram A or Diagram B is the sole correct reading of the WSLA.

Diagram A is consistent with what Bryan Garner and Antonin Scalia call the "series-qualifier canon."  As noted

earlier, canons of construction may help to construe an otherwise ambiguous provision.  The "series-qualifier canon" provides: "When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 147 (Thomson/West 2012).  While the "which" clause comes after an enumeration of offense types that is more complicated than a list of unmodified nouns or verbs, that enumeration is easily analogized to simple nouns.  Applying the principle in the "series-quantifier canon" results in treating the "which" clause as applicable to all three enumerated offense types.

Diagram B, by contrast, relies on what Scalia and Garner call the "last antecedent canon," which provides, "A pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent."  *Id.* at 144. Alternatively, Diagram B rests on a variation of the "last antecedent canon," the "nearest-reasonable-referent-canon," which provides, "When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable antecedent."  *Id.* at 149.

The canons of construction identified above are in conflict here. This court is not the first to see that the canons can conflict. One analyst of the canons calls them "overlapping" and notes:

> And the issue is a serious one, because the conclusion reached by applying the Series-Qualifier Canon is precisely the opposite of the conclusion reached by applying the Last-Antecedent Canon: under the Series-Qualifier Canon, the modifier applies to every item in the series, while under the Last Antecedent Canon it applies only to the item immediately preceding the modifier.

Neil Goldfarb, "Three Syntactic Canons," LAWnLinguistics, July 13, 2012, https://lawnlinguistics.com/2012/07/13/three-syntactic-canons (last visited September 25, 2019).

In a number of cases, courts have tackled the dilemma of the overlap between the "last antecedent canon" and the "series-qualifier canon." In *Barnhart v. Thomas*, 540 U.S. 20 (2003), the Supreme Court examined a statute addressing Social Security disability benefits. The statute referred to an impairment "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." The individual seeking benefits argued that her previous work had been as an elevator operator, but that such work no longer existed in the national economy. The Social Security Administration denied

benefits, arguing that "which exists in the national economy" applied only to "any other kind of substantial gainful work," not to "previous work." The Supreme Court accepted the Social Security Administration's reading, citing "the grammatical 'rule of the last antecedent.'" *Id.* at 26.

However, in doing that, the Court in no way suggested that the "last antecedent canon" always trumped the "series-qualifier canon." In the first place, the Court was applying *Chevron* deference to the agency's interpretation, a factor inapplicable in the present case. In the second place, although noting that application of the "last antecedent canon" is "sensible as a matter of grammar," the Court expressly noted that "this rule is not an absolute and can assuredly be overcome by other indicia of meaning." *Id. See also United States v. Hayes*, 555 U.S. 415, 425 (2009) (quoting *Barnhart*, 540 U.S. at 26).

In a more recent case, *Lockhart v. United States,* 136 S. Ct. 958 (2016), the Supreme Court once again applied the "last antecedent canon." This time the Court was parsing a criminal statute that included the words "under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward." The Court had to determine whether "involving a minor or ward" applied to all three actions, or only to "abusive sexual conduct." Justice Sotomayor, writing for the majority, concluded that the words

applied to the nearest act.  Justice Kagan, joined by Justice

Breyer, wrote a vigorous dissent, citing prior precedents that

counseled application of the "series-qualifier canon":

> Indeed, this Court has made clear that
> the last-antecedent rule does not generally
> apply to the grammatical construction present
> here: when "[t]he modifying clause appear[s]
> . . . at the end of a single, integrated
> list. *Jama*, 543 U.S. at 344, n.4, 125 S. Ct.
> 694.  Then, the exact opposite is usually
> true . . . .

*Id.* at 970.  *See also id.* at 969 (citing *Nobelman v. American*

*Savings Bank,* 508 U.S. 324, 330-31 (1993), for the proposition

that the "last antecedent canon" should not be applied when a

contrary interpretation is more reasonable); *O'Kane v. Apfel,* 224

F.3d 686, 690 (7th Cir. 2000) ("While O'Kane correctly applies

the last antecedent rule, the result is nonsensical."); *NW.*

*Forest Res. Council v. Glickman*, 82 F.3d 825, 833 (9th Cir.

1996)(noting that the "last antecedent canon" had to "yield to

the most logical meaning of a statute that emerges from its plain

language and legislative history").

Similarly, in *Paroline v. United States,* 134 S. Ct.

1710 (2014), the Court stated that when a modifying clause is

equally applicable to the first and other words as to the last,

"the natural construction of the language demands that the clause

be read as applicable to all."  *Id.* at 970 (quoting *Porto Rico*

*Railway, Light & Power Co. v. Mor,* 253 U.S. 345, 348 (1920)).

*See generally* Joseph Kimble, "How *Lockhart* Should Have Been Decided (Canons Are Not the Key)," 101 Judicature 40 (2017).

This court concedes that the argument for applying the "series-qualifier canon" would be strengthened if the "which" clause were immediately preceded by a comma separating the third enumerated offense category from the "which" clause. That slight separation might signal that the "which" clause was not restricted to modifying only the contract-related offenses identified in the third enumerated category. However, the absence of a comma should not be overemphasized.

The Supreme Court has noted, "[T]he Court has not hesitated in the past to change or ignore the punctuation in legislation in order to effectuate congressional intent." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 250 (1989); *Costanzo v. Tillinghast*, 287 U.S. 341, 344 (1932) ("It has often been said that punctuation is not decisive of the construction of a statute. Upon like principle we should not apply the rules of syntax to defeat the evident legislative intent." (citations omitted)); *Alvarez v. Longboy*, 697 F.2d 1333, 1339 (9th Cir. 1983) ("the statutory punctuation is not so reliable as to bar further inquiry into the legislative intent"). In *O'Kane v. Apfel,* the Seventh Circuit read a provision as if it had a comma, noting that that approach was "simpler--we need only read a comma

into the statute, instead of guessing which verb Congress intended." 224 F.3d at 690.

This court notes three other issues relating to the "which" clause. First, the WSLA includes a prepositional phrase ("with any disposition of termination inventory by any war contractor of Government agency") that introduces its own ambiguity. The statute refers to the running of any statute of limitations (1) involving fraud, (2) committed in connection with real or personal property, or (3) "committed in connection **with** the negotiation . . . of any contract . . . which is connected **with** or related to the prosecution of the war or directly connected **with** or related to the authorized use of the Armed forces, **or with the disposition of termination inventory by any war contractor or Government agency . . . .**" Does the boldfaced "with" prepositional phrase concerning termination inventory introduce an option within category (3), on the same level as a matter connected **with** the negotiation of any contract? Alternatively, does the boldfaced termination inventory phrase introduce an option on the same level as a matter **with** or related to the prosecution of the war or directly connected **with** or related to the authorized use of the Armed Forces?

"Termination inventory" is defined as "any materials (including a proper part of any common materials), properly allocable to the terminated portion of a war contract, except any

21

machinery or equipment subject to a separate contract specifically governing the use or disposition thereof." 41 U.S.C. § 103(l). Because the reference to "termination inventory" is a reference to materials that relate to a contract, the reference to "termination inventory" in the "with" prepositional phrase might suggest that the phrase is part of category (3). This reading appears to be bolstered by the reference to a "war contractor" in the "with" prepositional phrase. If the "with" prepositional phrase belongs to (3), then, coming as it does after the "which" clause, that would be an indication that the "which" clause applies only to category (3).

A reader might deem it natural to construe the "with" prepositional phrase as part of the listing of contracts covered by (3). *See* Diagram C.

Diagram C



However, this court cannot say that any other construction is necessarily unreasonable.  The "with" prepositional phrase can also be reasonably read as part of the "which" clause, which in turn may be reasonably read as applicable to (1), (2), and (3).  *See* Diagram D.

Diagram D



That is because the references to "termination inventory" and a "war contractor" are not necessarily limited to category (3).  It is easy to imagine fraud relating to "termination inventory" as addressed in (1).  It is similarly easy to imagine that "termination inventory" or a "war contractor" could be dealing with property of the United States, a matter covered by (2).

This court recognizes that Diagram D achieves a parallel construction by ignoring the words "or directly related to," which are included in the statutory language referring to war and to the authorized use of the Armed Forces, but not in the statutory reference to termination inventory.  No such ignoring of words is necessary to achieve parallelism in Diagram C.

Still, in terms of meaning, it is as easy to fit "termination inventory" under category (1) or (2) as it is to accept the Government's position that the charges against Nishiie, which fit naturally under (3), should be viewed as falling within (1). This court concludes that the "with" prepositional phrase does not solve the dilemma of the ambiguity seen in the overlap between the "last antecedent canon" and the "series-qualifier canon."

The second issue relating to the "which" clause that this court points out here is that if the "which" clause applies to (1), (2), and (3), then (3) is the only clause without a modifier tying it to the United States. Category (1) refers to fraud against the United States. Category (2) refers to real or personal property of the United States. If the "which" clause is not part of (and restricted to) category (3), then nothing in category (3) follows the pattern set in (1) and (2) of tying the category directly to the United States. But having recognized this feature, this court concludes that it too fails to resolve the statutory ambiguity. The absence of a reference in category (3) to the United States is entirely cured by the "which" clause even if it applies to all three categories. In that event, the "which" clause supplies the nexus between any contract covered by (3) and the United States. It would then be surplusage to include in (3) some reference to the United States.

The third issue this court notes relating to the "which" clause is that, if it is restricted in application to category (3), then the word "which" should really be "that," as "that" is the relative pronoun that should be used to introduce a restrictive clause. R.W. Birchfield, *The New Fowler's Modern English Usage* 773-75 (Rev'd 3d ed. 2000) (discussing the use of "that" and "which"). A "that" clause would indicate that only contracts relating to the war or the authorization for the use of the Armed Forces are in issue. Thus, one says, "I am giving you the book that is my all-time favorite," with the "that" clause restricting which book to only the all-time favorite. By contrast, a "which" clause usually introduces a nonrestrictive modifier that simply describes, as in "If you want to buy the book, which is my all-time favorite, you should go to Barnes & Noble, where it is on sale now." Of course, as with the absence of a comma, this court is cognizant that some grammatical lapses need to be taken in stride and not overemphasized.

The above parsing of the long sentence in the first paragraph of the WSLA establishes that, just as a matter of textual analysis, the "which" clause cannot be definitively said to apply to all three enumerated offense categories, any more than it can be definitively said to apply to only category (3).

## B. Controlling Precedents Do Not Require the Application of the "Last Antecedent Canon."

Only a handful of court cases have examined the WSLA. Unlike the Government, this court does not read any controlling precedent as prohibiting the application of the "series-qualifier canon," which would attach the "which" clause to (1), (2), and (3).

The Supreme Court issued two decisions discussing the WSLA on the same day in 1953. Neither case discussed whether the "which" clause applied to (1), (2), and (3), or only to (3).

*Bridges v. United States,* 346 U.S. 209 (1953), held that the kind of fraud for which the WSLA suspended the statute of limitations was only fraud "of a pecuniary nature or at least of a nature concerning property." *Id.* at 215. The fraud in issue concerned a false statement made under oath in a naturalization proceeding. Because that kind of fraud was not "of a pecuniary nature," the Court held that the running of the limitations period was not suspended. *Bridges* does not speak to the ambiguity addressed in this order.

*Bridges* nevertheless is helpful to an understanding of congressional intent, addressed later in this order. The Court noted that the legislative history of the WSLA indicated "a purpose to suspend the general statute of limitations only as to war frauds of a pecuniary nature or of a nature concerning

property.  It nowhere suggests a purpose to swallow up the [applicable] limitation to the extent necessary to reach the offenses before us." *Bridges*, 346 U.S. at 216 (emphasis added). The reference to "war frauds" is itself ambiguous, as it could be a reference to frauds occurring during a time of war, or to frauds relating to war.  The latter reading finds some support from the Court, which noted that the committee reports supporting the act showed that "Congress aimed the proviso at the pecuniary frauds growing out of war contracts.  Congress was concerned with the exceptional opportunities to defraud the United States that were inherent in its gigantic and hastily organized procurement program.  It sought to help safeguard the treasury from such frauds by increasing the time allowed for their discovery and prosecution." *Id.* at 218.

On the same day it decided *Bridges,* the Court decided *United States v. Grainger,* 346 U.S. 235 (1953).  *Grainger* involved the presenting of false invoices to the Commodity Credit Corporation for purchases of wool at prices that were not the actual prices paid.  The Commodity Credit Corporation was a federal agency involved with "making loans or purchases in connection with the expansion of the production of many commodities." *Id.* at 238 n.5.  Charges were brought in 1952 under the False Claims Act for offenses committed in 1945 and

1946.  Those charges would ordinarily have been subject to a three-year statute of limitations.

At the time *Grainger* was decided, the WSLA applied only when the United States was at war (the reference to the alternative of the enactment by Congress of a specific authorization for the use of the Armed Forces was not added until later).  The WSLA provided that the running of the statute of limitations was suspended until three years "after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution by Congress."  The President proclaimed the hostilities of World War II terminated as of December 31, 1946, so, if the WSLA applied, the Government had three years from that proclamation within which to bring charges.

*Grainger* held that the WSLA suspended the applicable limitations statute as to "violations of the false claims clause of the False Claims Act," and also held that the charges brought in 1952 were timely.  *Id.* at 237.  The Government reads *Grainger* as addressing offenses falling within category (1), and as not applying the "which" clause (with its requirement of a nexus with a war) to category (1).  While this is a possible reading of *Grainger,* this court is not certain that that is a correct reading.

Like the *Bridges* decision, *Grainger* did not mention the "which" clause at all. It is therefore unclear whether the Court even considered the issue of a nexus with war. Like *Bridges,* *Grainger* focused on which frauds fell within category (1). In ruling that category (1) covered violations of the false claims clause of the False Claims Act, the Supreme Court had no reason to address whether there was any relationship to war. While the Government assumes the Court's ruling flowed from a rejection of the war nexus requirement for a category (1) offense, it is just as plausible that the Court assumed that purchases in 1945 and 1946 had a nexus with World War II. After all, the court had just noted in *Bridges* that "Congress was concerned with the exceptional opportunities to defraud the United States that were inherent in its gigantic and hastily organized procurement program." 346 U.S. at 218. Of course, fighting abroad had ceased, but the Court's decision is remarkably short on detail. Indeed, the Court itself noted that it had little information about the offenses, saying, "[T]he offenses charged here are not spelled out in detail." 346 U.S. at 1072. It may have been that the wool purchases did indeed relate to war in some respect. They could, for example, have been purchases of "termination inventory" from the war, or of wool that had been purchased for or from a war ally. It is impossible to tell.

The offenses in *Grainger* appear to have arisen shortly
after American troops who had been fighting World War II abroad
returned home.  "[U]nderstanding the historical context in which
a statute was passed can help to elucidate the statute's purpose
and the meaning of statutory terms and phrases." *Cty. of Amador
v. U.S. Dep't of Interior*, 872 F.3d 1012, 1022 (9th Cir. 2017)).
World War II engulfed the consciousness of the entire country.
Few families were untouched by that conflict.  Around the world,
more than 16 million servicemen fought during World War II; more
than 400,000 were killed.  *See* U.S. Dep't of Veterans Affairs,
*America's Wars*, https://www.va.gov/opa/publications/
factsheets/fs_americas_wars.pdf (last visited September 25, 2019)
(indicating that 16,112,566 worldwide servicemembers participated
in World War II, of which 291,557 were killed in battle and
113,842 were killed in "non-theater" deaths); Nese F. DeBruyne,
Congressional Research Service, *American War and Military
Operations Casualties: Lists & Statistics* at 2, Table I
(Principal Wars or Conflicts in Which United States Participated:
U.S. Military Personnel Serving and Casualties),
https://fas.org/sgp/crs/natsec/RL32492.pdf (last visited
September 25, 2019) (stating that 16,112,566 served in World
War II, of which 405,399 were killed).  *See* Waldman, Paul,
*American War Dead, By the Numbers*, https://prospect.org/article/
american-war-dead-numbers (May 26, 2014) (last visited September

25, 2019).  As Paul Waldman notes, "During the two world wars, virtually everyone would have had loved ones who participated in the war in some way, which becomes much clearer if we look at those numbers in relation to the size of the country.  As a proportion of the population, 14 times as many Americans served in World War II as did in the wars of the last decade."  *Id.*

Given the scope of World War II and its effects on the entire country, it is not implausible to think that the Supreme Court might have viewed the crimes in issue in *Grainger* as affected by World War II or as part of its aftermath.

More recently, the Supreme Court has had occasion to address whether civil claims under the False Claims Act are subject to the tolling provisions of the WSLA.  In *Kellogg Brown & Root Services, Inc. v. United States ex. rel. Carter,* 135 S. Ct. 1970 (2015), the Court held that the WSLA does not suspend limitation periods for civil claims.  Here too the Court did not address the applicability of the "which" clause.

The Ninth Circuit just last year did look at the "which" clause, but it did so in an unpublished decision.  Circuit Rule 36-3(a) provides: "Unpublished dispositions and orders of this Court are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion."  This court may nevertheless cite the unpublished decision under Rule 32.1 of the Federal

Rules of Appellate Procedure.  Unfortunately, the Ninth Circuit decision, *United States v. Jucutan,* 756 Fed. Appx. 691 (9ᵗʰ Cir. 2018), does not resolve the dilemma before this court.  The Ninth Circuit placed the offenses in issue in *Jucutan* into category (3), and there was no dispute that the "which" clause applied to category (3).  Although the dissent questioned whether the Government had satisfied the requirement in the "which" clause of a nexus with an authorization for the use of Armed Forces, there was no reason to discuss whether the "which" clause applied to categories (1) and (2).

There are certainly other cases decided by circuit and district courts concerning the WSLA, but most do not address the "which" clause at all.  *United States v. Delia,* 906 F.3d 1212 (10ᵗʰ Cir. 2018), for example, focused on whether fraud relating to Medicaid, which was administered by Oklahoma, was a fraud against the United States.  Concluding that it was not, the Tenth Circuit declined to apply the WSLA to toll the running of the limitations period.  *United States v. Melendez-Gonzalez,* 892 F.3d 9 (1ˢᵗ Cir. 2018), did apply the WSLA to fraud committed in connection with recruiting for the National Guard.  The case did not discuss the need for a nexus to war or to an authorization for the use of the Armed Forces.  While this silence might be seen as an implicit determination that no nexus was required, the court reads the decision as instead suggesting that there was a

built-in nexus.  The defendants were recruiting under the National Guard Recruiting Assistance Program between 2006 and 2008.  That program had been instituted in 2005 by the Department of Defense "to help recruit soldiers during the ongoing conflicts in Iraq and Afghanistan."  *Id.* at 13.

In some cases, the absence of any reference to a nexus requirement appears to reflect the limited question before the court.  Both *United States v. Frediani,* 790 F.3d 1196 (11th Cir. 2015), and *United States v. Pflueger,* 685, F.3d 481 (5th Cir. 2012), held that the WSLA suspended the running of the applicable limitations statutes.  However, both cases also expressly stated that those holdings flowed from the courts' examination of whether hostilities had terminated.  That is, the courts were looking at whether the "until" adverbial clause at the end of the long sentence was satisfied, not at how the "which" clause functioned.  *See Frediani,* 790 F.3d at 1197 ("This appeal requires us to decide whether hostilities related to the use of military force against terrorists and Iraq, as authorized by Congress, have 'terminat[ed]'" under the WSLA.); *Pflueger,* 685 F.3d at 484 ("Pflueger's challenge only concerns the terminating clause.").

A number of cases implicate the 2008 amendments to the WSLA.  Before the amendment, the WSLA applied only when the United States was at war.  Courts were thus required to determine

whether the country was at war, or, in some instances, whether the 2008 amendments applied retroactively.  *See, e.g., United States v. Latimer,* 2012 WL 1023569 (W.D. Okla Mar. 27, 2012); *United States v. Anghaie,* 2011 WL 720044 (N.D. Fla. Feb. 21, 2011); *United States v. W. Titanium, Inc.,* 2010 WL 2650224 (S.D. Cal. July 1, 2010).  These particular cases provide little assistance as to the applicability of the "which" clause.

During the hearing on this motion, the Government urged this court to pay particular attention to *United States v. Prosperi*, 573 F. Supp. 2d 436 (D. Mass. 2008).  That case involved allegations of fraud during the "Big Dig," in which work on an underground tunnel was performed.  The defendants allegedly submitted false concrete batch reports.  The indictment was filed in 2006, before the WSLA's 2008 amendments.  As this court notes later in this order, the 2008 amendments materially affect how this court views congressional purpose.

The *Prosperi* court was asked "to determine whether the United States is presently at war, and, if so, with whom."  In the course of answering those questions, the court discussed *Grainger*, the 1953 Supreme Court case involving wool purchases. *Prosperi* described *Grainger* as addressing "a decidedly unmilitary World War II-era conspiracy to defraud the Commodity Credit Corporation."  *Id.* at 441.  This court has earlier noted that *Grainger* is short on detail about the wool purchases.  *Prosperi*

then states the scheme discussed in Grainger had "no discernible connection to the war effort," concluding, "To that fact the Supreme Court gave short shrift . . . ." This court agrees that there was no "discernible connection to the war effort," but thinks it fair to say that there was also nothing to indicate a lack of connection. And to describe the Supreme Court as giving "short shrift" to "that fact" appears to this court to be overstating the Supreme Court's review of the facts of *Grainger.* The Supreme Court in *Grainger* did not make any statement one way or the other about whether the wool purchases related to the war.

Then, relying on the above characterization of *Grainger,* the court in *Prosperi* said:

> In light of *Grainger*, it makes no difference that the fraud in this case involved a construction project unrelated to the Iraqi or Afghani conflicts. In the few cases since *Grainger* in which the government has successfully invoked the Suspension Act, the absence of a connection between the fraud and wartime procurement has played no part.

573 F. Supp. 2d at 442 (citations omitted). This conclusion rests on the district court's determination that the wool purchases in *Grainger* had no connection to World War II, a proposition that this court does not think is at all clear from the *Grainger* decision itself.

In short, this court continues to think that existing case law does not resolve the ambiguity relating to whether the

"which" clause applies to (1), (2), and (3). This court turns

for guidance to the legislative history of the WSLA.

>    **C.    The Legislative History Suggests that the "Which"
>            Clause Applies to All Three Offense Categories.**

The WSLA is a deviation from the usual concept that

criminal charges must be brought within specified time periods.

Usually, "evidentiary concerns--for example, concern that the

passage of time has eroded memories or made witnesses or other

evidence unavailable," are reflected in statutes of limitations

that codify "a legislative judgment that, after a certain time,

no quantum of evidence is sufficient to convict." *Stogner v.*

*Cal.*, 539 U.S. 607, 615 (2003).

>           The purpose of a statute of limitations is to
>           limit exposure to criminal prosecution to a
>           certain fixed period of time following the
>           occurrence of those acts the legislature has
>           decided to punish by criminal sanctions.
>           Such a limitation is designed to protect
>           individuals from having to defend themselves
>           against charges when the basic facts may have
>           become obscured by the passage of time and to
>           minimize the danger of official punishment
>           because of acts in the far-distant past.
>           Such a time limit may also have the salutary
>           effect of encouraging law enforcement
>           officials promptly to investigate suspected
>           criminal activity.

*Toussie v. United States*, 397 U.S. 112, 114–15 (1970). Thus, the

limitations periods for criminal statutes must be "liberally

interpreted in favor of repose." *Id.* (quotation marks and

citation omitted).

The WSLA is "an exception to a longstanding congressional 'policy of repose' that is fundamental to our society and our criminal law" such that it should be narrowly construed. *Bridges*, 346 U.S. at 215–16. "[T]he WSLA should be narrowly construed and interpreted in favor of repose." *Kellogg Brown & Root Servs.,* 135 S. Ct. at 1978 (quotation marks and citations omitted).

The WSLA, in the form originally enacted in the immediate aftermath of World War II, differed from the version now in effect in three respects. The original statute read:

> When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war, or with any disposition of termination inventory by any war contractor or Government agency, shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.

> Definitions of terms in section 103 of title 41 shall apply to similar terms used in this section.

18 U.S.C. § 3287, 62 Stat. 828 (June 25, 1948).

The first difference between the original and the present version is found at the very start of the statute. In the original version, there is a reference to a suspension of the statute of limitations only when "the United States is at war." There is no additional reference, as there is in the present version, to a suspension of any limitations period during a time when an authorization for the use of the Armed Forces is in effect. The 2008 amendment added the following boldfaced language at the start of the statute: "When the United States is at war **or Congress has enacted a specific authorization for the use of the Armed Forces**, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)) . . . ." *See* Sec. 8117, Pub. L. 110-329, 122 Stat. 3647 (Sept. 30, 2008).

The second difference occurs in the "which" clause, identified earlier in this order as central to this court's analysis. Following the enumeration of the three types of crimes in issue, the original version of the WSLA included a "which" clause that referred only to matters "connected with or related to the prosecution of the war," without any reference to a connection to an authorized use of the Armed Forces. The 2008 amendment added a reference to the "authorized use," as highlighted in boldface: "which is connected with or related to the prosecution of the war **or directly connected with or related to the authorized use of the Armed Forces** . . . " *Id.*

The third difference between the original and present versions of the WSLA relates to the length of time a limitations period is tolled.  Under the original version, a limitations period is tolled "until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress."  In 2008, Congress lengthened that period to five years after the termination of hostilities.

AS noted earlier in the present order, the charges in the present case fit into more than one offense category.  They appear to fit naturally into category (3), relating to contracts, but the Government has opted to treat them as falling within category (1), relating to frauds against the United States.  The Government is not disputing that, for the WSLA to suspend the running of a statute of limitations for an offense in category (3), the Government must show a nexus between the offense and either a war or an authorization for the use of the Armed Forces.  The Government argues, however, that the charges in this case fit under category (1), governing fraud against the United States, and that category (1) requires no such nexus.  The legislative history of the present version of the WSLA suggests that Congress intended to require a nexus for category (1).

The Government is not contending that the United States is now engaged in a conflict that can be considered a war.  The Government is therefore deeming the WSLA triggered under the

"when" clause by an authorization for the use of the Armed

Forces.  There are now in effect two specific authorizations for

the use of the Armed Forces: (1) the Authorization for Use of

Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001)

(authorizing the use of United States Armed Forces against those

responsible for the September 11, 2001, terrorist attacks,

including in Afghanistan); and (2) the Authorization for Use of

Military Force Against Iraq Resolution of 2002, Pub. L. No.

107-243, 116 Stat. 1498 (2002) (authorizing the use of United

States Armed Forces against Iraq).  *See Melendez-Gonzalez*, 892

F.3d at 15 (ruling that the 2001 Authorization for Use of

Military Force triggered the WSLA); *DeLia*, 906 F.3d at 1218

(noting that the 2001 and 2002 authorizations for use of military

force triggered the WSLA); *Frediani*, 790 F.3d at 1200 (concluding

that the 2001 and 2002 authorizations for use of military force

triggered the WSLA); *Jucutan*, Crim. No. 15-00017, Memorandum

Decision and Order Denying Defendant's Motion to Dismiss, ECF No.

82 at 3 (D. N. Mar. I, May, 17, 2016) (noting that there was no

dispute that the United States is "at war" for purposes of the

WSLA), *aff'd*, 765 Fed. Appx. 691, 692 (9th Cir. 2018) (ruling

that the district court "did not plainly err by concluding that

the Wartime Suspension of Limitations Act (WSLA), 18 U.S.C.

§ 3287, applied to toll the five-year limitations period" and

noting that the Government had sufficiently demonstrated that the

40

crimes charged were "directly connected with or related to" the
2001 and 2002 authorizations for military force).

The WSLA tolls certain limitations periods "until 5
years after the termination of hostilities as proclaimed by a
Presidential proclamation, with notice to Congress, or by a
concurrent resolution of Congress."  There has been neither a
proclaimed termination of the hostilities covered by the
authorizations, nor a concurrent resolution of Congress noting a
termination.  *See*, *e.g.*, *United States v. Rivera-Rodriguez*, 2016
WL 3774200, at *2 (D.P.R. July 12, 2016) ("there has been no
termination of hostilities under the WSLA because there has been
no formal presidential proclamation or a concurrent resolution of
Congress indicating as much").

While a minority of courts have concluded otherwise, it
is unclear how such a conclusion implements the WSLA's plain
language requiring a Presidential proclamation, with notice to
Congress, or a concurrent resolution of Congress.  In *Prosperi*,
for example, the court stated:

> On December 22, 2001, the United States
> formally recognized and extended full
> diplomatic relations to the new government of
> Hamid Karzai.  That recognition signaled the
> cessation of a state of war with Afghanistan.
> Accordingly, the statute of limitations with
> respect to the Afghan conflict, expired on
> December 22, 2004.  Similarly, on May 1,
> 2003, President Bush, while aboard the USS
> Abraham Lincoln, proclaimed that "[m]ajor
> combat operations in Iraq have ended.  In the
> Battle of Iraq, the United States and our

> allies have prevailed.  And now our coalition
> is engaged in securing and reconstructing
> that country."  Consequently, with regards to
> the Iraq conflict, the statute of limitations
> expired on May 1, 2006.

573 F. Supp. 2d at 455 (footnotes omitted); *see also United States v. Pearson*, 2010 WL 3120038, at *2 (S.D. Miss. Aug. 4, 2010) (adopting reasoning of *Prosperi*).

Other courts have rejected *Prosperi*, ruling instead that the plain language of the WSLA requires an actual Presidential proclamation, with notice to Congress, or a concurrent resolution of Congress.  *See United States v. Doost*, 2019 WL 1560114, at *11 (D.D.C. Apr. 10, 2019) ("*Prosperi*'s holding has been uniformly rejected."); *Pfluger*, 685 F.3d at 485.

In *Frediani*, the Eleventh Circuit noted that "it is not incumbent on our Court to demarcate the end of hostilities.  The statute makes clear that the political branches must make that determination."  790 F.3d at 1200 (quotation marks, alterations, and citations omitted).

Nothing in the record suggests that Nishiie's alleged crimes were directly connected with or related to the authorized use of the Armed Forces in Afghanistan or Iraq.  The question here is whether the "which" clause requires that nexus for all three offense categories.

In 2008, Senator Patrick Leahy introduced Senate Bill 2892, which pertained to the Wartime Enforcement of Fraud Act of

42

2008, proposing to add language to the WSLA that would make it

applicable even in the absence of a formal war.  Leahy said that

the bill's purpose was to "make current law suspending the

statute of limitations during wartime applicable to the ongoing

conflicts in Iraq and Afghanistan."  154 Cong. Rec. S3174 (Apr.

18, 2008).[5]  Senate Report No. 110-431, which pertains to Senate

Bill 2892, similarly states that it "makes current law extending

the statute of limitations during wartime applicable to the

conflicts in Iraq and Afghanistan."  The report explains that the

WSLA was originally enacted because of the "extreme difficulty in

tracking down contracting fraud in the midst of a war."  The

report further notes that, in "recent years, war contracting

fraud has again plagued this nation during the engagement of U.S.

forces in Iraq and Afghanistan" and states that, "[u]nless the

statute of limitations is extended, . . . investigations may well

---

[5] "[O]rdinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history."  *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 (1980).  Nevertheless, "[l]egislators deliberating upon a bill may look to its sponsor as someone who is particularly well informed about the bill's purpose, meaning, and intended effect.  Consequently, courts may use statements by a bill's sponsor as an interpretive aid . . . .  This rule that courts may infer legislative intent from a sponsor's statement applies only where the statement is consistent with a statute's language and other legislative history.  In no event are contemporaneous sponsor remarks controlling to analyze legislative history."  2A Norman J. Singer and Shambie Singer, *Statutes & Statutory Construction* § 48.15 (9th ed. 2014); *see also Galvan v. Press*, 347 U.S. 522, 526 (1954) (examining statements by a sponsor of a statute to determine congressional intent).

be shut down before they can be completed and wartime fraud will go unpunished."  Extensions of the limitations periods were intended to "give investigators and auditors additional time to thoroughly review all war contracts and bring those who have defrauded the American taxpayers to justice."  According to the report, "[i]f the current law is left unchanged, each passing day of the conflicts in Iraq and Afghanistan would result in a grant of immunity for fraudulent conduct by war contractors that has gone undiscovered or unprosecuted during the conflicts."

The Senate Report concludes, "The Wartime Enforcement of Frauds Act, S. 2892, would close a loophole in current law and give the government new power to prosecute contracting fraud in Iraq and Afghanistan."  The Senate Report did not indicate that Congress intended to suspend the limitations period for all forms of fraud against the United States, regardless of whether the fraud was or was not tied to an authorization for the use of the Armed Forces.

In 2008, the entire country was not subject to the same kind of nationwide focus on military conflict and its immediate aftermath that had prevailed when the Supreme Court decided *Grainger* in 1953.  It is easy to see how, in 1953, with the entire nation only a few years from an all-consuming war, all manner of pecuniary fraud, whether or not related to World War II, may have been affected.  It is not as easy to see how, in

2008, the conflicts in Afghanistan and Iraq were delaying the discovery or investigation of frauds unrelated to those conflicts.

Senate Bill 2892 did not become law.  However, its language was included in another bill that did become law.  The language that Senator Leahy spoke about and that the Senate report discussed became section 8117 of Public Law 110-329, part of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009 (Sept. 30, 2008), and is now codified in the version of the WSLA now in effect.  *See* Cong. Rec. S9964 (Sept. 27, 2008) ("Mr Leahy.  Mr. President, it is encouraging that Congress today passed the Wartime Enforcement of Fraud Act of 2008 as part of the Consolidated Security, Disaster Assistance and Continuing Appropriations Act.").  Accordingly, the legislative history regarding Senate Bill 2892 appears applicable to Public Law 110-329.

That legislative history includes Senator Leahy's statements regarding Amendment 5323 to the appropriations bill, which added new language to the WSLA:

> Current law extends the statute of
> limitations for contracting fraud offenses
> during wartime to address this problem.  In
> other words, if fraud has occurred, you have
> a certain statute of limitations.  We would
> simply extend it.  This commonsense law was
> passed by Congress during World War II with
> the support of President Roosevelt.  A
> similar provision was passed in World War I.

> Those were wars in which we were involved for
> less time than we have been involved in Iraq
> and Afghanistan.  Current law only applies to
> declared wars and not to circumstances where
> Congress only authorizes the use of military
> force rather than officially declaring war.
> So the extension of the statute of
> limitations doesn't apply to the ongoing wars
> in Iraq and Afghanistan.
>
> The bipartisan Wartime Enforcement of
> Fraud Act will close that technical loophole.
> It will apply the law that we already have on
> the books, but it will apply it not only to
> declared wars but also to the wars in Iraq
> and Afghanistan. . . .  With each passing
> day, we are losing the legal authority to
> prosecute fraud in Iraq and Afghanistan
> because the existing law that extends the
> statute of limitations does not apply to
> these wars.

154 Cong. Rec. S8230 (Sept. 10, 2008).

Thus, in adding language making the WSLA applicable to

authorizations for the use of force, Congress expressed an intent

to have the WSLA toll the limitation periods for crimes arising

out of conduct relating to Afghanistan and Iraq.  While the added

language may apply to future authorizations for the use of

military force beyond Afghanistan and Iraq, nothing in the

legislative history indicates that Congress intended to toll the

limitations periods with respect to all pecuniary frauds

committed against the Government.

This court recognizes that Congress is presumed to know

and understand the state of the law at the time it amends a

statute.  *See Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) ("When

Congress amends the bankruptcy laws, it does not 'write on a clean slate.'"); *Lindsey v. Lessee of Miller*, 31 U.S. 666, 669 (1832) ("When in 1807 congress passed the law, they must be presumed to have legislated on the then existing state of things."); *Porter v. Bd. of Trustees of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1072 (9th Cir. 2002) ("We presume that when Congress amends a statute, it is knowledgeable about judicial decisions interpreting the prior legislation."); *In re Bonner Mall P'ship*, 2 F.3d 899, 913 (9th Cir. 1993) ("Where the text of the Code does not unambiguously abrogate pre-Code practice, courts should presume that Congress intended it to continue unless the legislative history dictates a contrary result."), *cert. granted*, 510 U.S. 1039, *but dismissed as moot,* 513 U.S. 18 (1994). "[W]hen judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (quotation marks and citation omitted).

This court presumes that Congress knew of the 1953 Supreme Court decisions interpreting the WSLA. But when Congress then makes clear that its 2008 amendment was intended to extend statutes of limitations with respect to war frauds in Afghanistan

and Iraq, that intent should not be ignored.  Charges against Nishiie could not have been brought in reliance on the WSLA if we were still operating under the version of the WSLA in effect when *Grainger* was decided.  That version applied only if the nation was at war.  In relying on an authorization for the use of the Armed Forces, the Government is relying on the version of the WSLA that includes the 2008 amendments.  Those amendments changed the WSLA, and the reason for the changes is relevant here.

Given the discussion in *Grainger* about congressional intent in enacting the original version of the WSLA, 346 U.S. at 244, it is fair to assume that, had the *Grainger* Court had before it the legislative history of the 2008 amendments, the Court would have taken that into account also.  Application of the "which" clause to only category (3) offenses would contravene the intent of Congress as expressed in connection with the 2008 amendments.  Even assuming *Grainger* should be read as ruling that no nexus between a pecuniary fraud and war had to be established in 1953, it is unclear why such a decision should continue to govern when the WSLA has changed, and a different congressional intent has been articulated.

To be consistent with the 2008 amendments to the WSLA and the purpose of those amendments, the "which" clause in the WSLA must be applied to all three types of enumerated offenses. To hold otherwise would allow the tolling of matters entirely

unrelated to the military authorizations with respect to Afghanistan and Iraq. But Congress has given no indication that it intends for the mere existence of an authorization to suspend a limitations period for a crime that is unrelated to the authorization and so could be prosecuted within the normal limitations period. It cannot be said that all investigators and prosecutors are so focused on Afghanistan and Iraq that even fraud unrelated to those conflicts will not be uncovered. *See Edwards*, 482 U.S. at 595 ("in determining the legislative purpose of a statute, the Court has also considered the historical context of the statute . . . and the specific sequence of events leading to passage of the statute"); *County of Amador*, 872 F.3d at 1022 (courts may look to the historical context in which a statute was passed to determine the statute's purpose).

This court is well aware of the need for any court to avoid substituting its own policy preferences for those Congress has articulated. *See Yates v. United States*, 574 U.S. 528, ---, 135 S. Ct. 1074, 1101 (2015) (Kagan, J., dissenting) ("If judges disagree with Congress's choice, we are perfectly entitled to say so—in lectures, in law review articles, and even in dicta. But we are not entitled to replace the statute Congress enacted with an alternative of our own design."). To the contrary, this court is laboring to implement congressional purpose in construing a statute that appears amenable to more than one reasonable

interpretation.  In so doing, this court has in mind the Supreme

Court's admonition that exceptions to statutes of limitations

should be narrowly construed.  *Bridges*, 346 U.S. at 215-16.

> **D.   Under the "Rule of Lenity," the "Which" Clause**
> **Should be Read as Applying to All Three Offense**
> **Categories.**

The Government says:

> The Indictment alleges that the defendant,
> while serving as a contracting officer for
> the Army Corps of Engineers, Far East
> District, from 2006 to 2012 in the Republic
> of Korea, engaged in various unlawful acts in
> order to unlawfully steer two contracts
> related to the Yongsan Base Relocation
> Project (YRP), which were valued at more than
> $400 million, to SK Engineering &
> Construction (SK), a Korean company, in
> exchange for millions of dollars in bribes.

ECF No. 96, PageID # 428.  This summary makes it easy to see that

the crimes alleged in the Indictment fit within the third offense

category; that is, the crimes were allegedly "committed in

connection with the negotiation, procurement, [or] award . . . of

any contract."

As noted earlier, the Government does not dispute that

the "which" clause applies to the third category, meaning that

crimes in the third category must be "directly connected with or

related to the authorized use of the Armed Forces."  The

Government has made no attempt to connect the charges against

Nishiie with the conflict in Afghanistan or Iraq.  Instead, the

Government ignores the third category entirely, choosing to place

50

Nishiie's alleged crimes in the first category, covering offenses "involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not." The Government then asks this court not to require any nexus between the alleged fraud and the authorization of military force in Afghanistan and Iraq. Quite apart from the "series-qualifier canon" discussed earlier in this order, this argument runs afoul of another canon of construction, the canon commonly referred to as the "rule of lenity."

That canon provides that "'ambiguity concerning the ambit of criminal statutes should be resolved in the favor of lenity.'" *United States v. LeCoe*, 936 F.2d 398, 402 (9th Cir. 1991) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). The "rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion). "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (quotation marks and citation omitted); *United States v. Hayes*, 555 U.S. 415, 429 (2009). "This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a

violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed.  It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead."  *Santos*, 553 U.S. at 514.

Lenity is appropriate not only when faced with ambiguous text, but also when faced with ambiguous legislative history.  As the Supreme Court has said, "Although the rule of lenity is not to be applied where to do so would conflict with the implied or expressed intent of Congress, it provides a time-honored interpretive guideline when the congressional purpose is unclear."  *Liparota v. United States,* 471 U.S. 419 (1985).  Thus, even if one thinks that the intent of Congress is not as clear as this court has posited, lenity tips the balance in favor of Nishiie.  Then-Judge Neil Gorsuch, writing for an en banc Tenth Circuit, put it this way:

> To the extent any ambiguity remains at this point about the meaning of § 924(c)(1)(A)--after we have exhausted all the evidence of congressional meaning identified by the parties--we don't default to the most severe possible interpretation of the statute but to the rule of lenity.  *United States v. Bass,* 404 U.S. 336, 347-49, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971).  Our job is always in the first instance to follow Congress's directions.  But if those directions are unclear, the tie goes to the presumptively free citizen and not the prosecutor.

*United States v. Rentz,* 777 F.3d 1105, 1113 (10th Cir. 2015).

If the "rule of lenity" is not applied here, there is a risk that category (3) of the WSLA will become a nullity. That would contravene an additional canon of construction. Referred to by Scalia and Garner as the "surplusage canon," *see* Scalia and Garner at 174, the Supreme Court calls it an "'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'" *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)). The Government contends that Nishiie's alleged fraud with respect to steering military base contracts in Korea falls under the first offense category, which involves fraud-based crimes, rather than the more specific contract-based crimes in the third category. Arguing that the "which" clause (requiring a nexus between an offense and war or a military authorization) applies only to category (3), the Government will likely never characterize any offense it charges as falling under category (3). The Government will instead always argue that offenses fall under (1) or (2), neither of which, in the Government's view, must be tied to war or a military authorization. But it is entirely unclear why the Government's desire to avoid the "which" clause should be allowed to nullify an entire offense category in the WSLA.

This court has already acknowledged in this order that a court's job is not to second-guess Congress on what makes sense

from a policy standpoint, but this court notes that applying the
"rule of lenity" and the "surplusage canon" here leads to a very
common-sense result.  That is so in two respects.

First, many offenses against the United States are
unaffected by any war or any authorization for the use of
military force, and suspending the statute of limitations for
such unaffected crimes makes little sense.  Why, for example,
would Congress want ongoing hostilities in Iraq to cause the
Internal Revenue Service to have nearly unlimited time to
discover a taxpayer's deliberate under-reporting of the income he
earned at the bakery he owns?  Similarly, if an individual claims
Social Security benefits that he is not entitled to, what reason
would Congress have for giving the Government extra years to
discover that?

Second, relying on the "rule of lenity" to apply the
"which" clause to (1), (2), and (3) is a reading in line with
what Justice Kagan, in her dissent in *Lockhart*, called the
"ordinary understanding of how English works, in speech and
writing alike."  *Lockhart*, 136 S. Ct., at 969 (Kagan, J.,
dissenting).  Justice Kagan gave some common-sense examples of
how English works:

> Imagine a friend told you that she hoped to
> meet "an actor, director, or producer
> involved with the new Star Wars movie."  You
> would know immediately that she wanted to
> meet an actor from the Star Wars cast--not an
> actor in, for example, the latest Zoolander.

> Suppose a real estate agent promised to find
> a client "a house, condo, or apartment in New
> York." Wouldn't the potential buyer be
> annoyed if the agent sent him information
> about condos in Maryland or California? And
> consider a law imposing a penalty for the
> "violation of any statute, rule, or
> regulation relating to insider trading."
> Surely a person would have cause to protest
> if punished under that provision for
> violating a traffic statute. The reason in
> all three cases is the same: Everyone
> understands that the modifying phrase--
> "involved with the Star Wars movie," "in New
> York," "relating to insider trading"--applies
> to each term in the preceding list, not just
> the last.

*Id.* Taking this kind of common-sense approach to language, and in light of the "rule of lenity" and the evidence summarized above of congressional purpose, this court reads the "which" clause in the WSLA as applicable to offenses in all three enumerated categories.

**IV.      CONCLUSION.**

The WSLA does not toll the limitations periods for the crimes alleged in the Indictment. Given this ruling, the parties are ordered to meet and confer to see whether they can agree about which, if any, count or portion of a count should be dismissed. No later than October 8, 2019, the parties must file a statement about whether an agreement has been reached. If no agreement can be reached, then, no later than October 18, 2019, Nishiie shall file a supplemental brief of no more than 2500 words discussing which count(s) should be dismissed or narrowed,

and why.  The Government may respond in no more than 2500 words
no later than November 1, 2019.  Nishiie may file an optional
reply memorandum of no more than 1250 words no later than
November 8, 2019.  No further briefing will be allowed.

          IT IS SO ORDERED.

          DATED: Honolulu, Hawaii, September 27, 2019.



                                   /s/ Susan Oki Mollway
                              Susan Oki Mollway
                              United States District Judge


United States of America v. Nishiie, Crim. No. 17-00550 SOM; ORDER REJECTING THE
ARGUMENT THAT THE WARTIME SUSPENSION OF LIMITATIONS ACT TOLLS THE STATUTES OF
LIMITATIONS WITH RESPECT TO THE CRIMES ALLEGED IN THE INDICTMENT